1

2

3

4

5 UNITED STATES DISTRICT COURT

6 NORTHERN DISTRICT OF CALIFORNIA

7

8 SAMUEL WEBB,                                    No. C 06-4839 MHP (pr)

9          Petitioner,                          **ORDER DENYING HABEAS
                                                 PETITION**
10      v.

11 A. P. KANE, warden,

12          Respondent.
                                               /
13

14                              **INTRODUCTION**

15        Samuel Webb, a prisoner at the Correctional Training Facility in Soledad, filed this

16 pro se action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge the parole

17 board's 2003 decision that he was not suitable for parole.   The petition will be denied.

18                              **BACKGROUND**

19        Samuel Webb was convicted on a guilty plea in 1984 in Los Angeles County Superior

20 Court of second degree murder and robbery, and admitted to use of a firearm in the

21 commission of the robbery.  He is currently serving a sentence of 15 years to life in prison on

22 the murder.  His sentence also included 5 years on the robbery plus a 1-year enhancement for

23 the firearm, both of which were stayed until completion of the murder sentence.  His habeas

24 petition does not concern that conviction directly, but instead focuses on the November 17,

25 2003 decision by the Board of Prison Terms (now known as and referred to herein as Board

26 of Parole Hearings ("BPH")) to find him not suitable for parole.  As of the time of the BPH

27 hearing, Webb had been in custody about 19 years on his 15-to-life sentence.

28

**United States District Court**
For the Northern District of California

The specifics regarding the crime and the circumstances regarding parole suitability are described in the Discussion section later in this order.   Briefly, petitioner and three fellow street gang members committed an armed robbery of three people during which one of his confederates shot and killed one of the people they were robbing.  The BPH found Webb unsuitable for parole for several reasons, including the commitment offense, Webb's escalating pattern of criminality, his unstable social history, and his disciplinary record in prison.  Webb sought relief in the California courts.  The Los Angeles County Superior Court denied his petition in a reasoned order.  Resp. Exh. 5.  The California Court of Appeal and California Supreme Court summarily denied his petitions.  Resp. Exhs. 6 and 7.

Webb then filed his federal petition for writ of habeas corpus, asserting that his right to due process had been violated because (1) there was not sufficient evidence to support the decision, (2) his plea agreement had been breached, and (3) the BPH failed to set a term using the matrix.  Respondent filed an answer.  Webb filed a traverse.  The matter was transferred from the U.S. District Court for the Central District of California to this district after having been fully briefed.  The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action occurred at the Correctional Training Facility in Soledad.  Soledad is in Monterey County and within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.    Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board or the governor.  Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is

1  minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . .

2  board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v.

3  Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly

4  established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

5       Having determined that there is a due process right, and that some evidence is the

6  evidentiary standard for judicial review, the next step is to look to state law because that sets

7  the criteria to which the some evidence standard applies.  One must look to state law to

8  answer the question, "'some evidence' of what?"

9  B.     State Law Standards For Parole For Murderers In California

10      California uses indeterminate sentences for most non-capital murderers, with the term

11  being life imprisonment and parole eligibility after a certain minimum number of years.  For

12  example, the minimum period for second degree murder is 15 years and for first degree

13  murder is 25 years.   See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126

14  S. Ct. 92 (2005); Cal. Penal Code §§ 190.  California's parole scheme described below

15  provides that a release date normally must be set unless various factors exist, but the "unless"

16  qualifier is substantial.

17      A BPH panel meets with an inmate one year before the prisoner's minimum eligible

18  release date "and shall normally set a parole release date. . . . The release date shall be set in a

19  manner that will provide uniform terms for offenses of similar gravity and magnitude in

20  respect to their threat to the public, and that will comply with the sentencing rules that the

21  Judicial Council may issue and any sentencing information relevant to the setting of parole

22  release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the

23  panel "shall set a release date unless it determines that the gravity of the current convicted

24  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

25  is such that consideration of the public safety requires a more lengthy period of incarceration

26  for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.

27  Penal Code § 3041(b).

28      One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole

4

date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A

parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A

parole date set under this article shall be set in a manner that provides uniform terms for

offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The

regulation also provides that "[t]he panel shall first determine whether the life prisoner is

suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be

found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose

an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §

2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal.

Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of

crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix

of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,

depending on some of the facts of the crime.   Some prisoners estimate their time to serve

based only on the matrix.   However, going straight to the matrix to calculate the sentence

puts the cart before the horse because it ignores critical language in the relevant statute and

regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's

expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg,

34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the

prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he

panel shall set a base term for each life prisoner who is found suitable for parole").  The

California Supreme Court's determination of state law in Dannenberg is binding in this

federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can

alone support a sentence longer than the statutory minimum even if everything else about the

prisoner is laudable.  "While the Board must point to factors beyond the minimum elements

of the crime for which the inmate was committed, it need engage in no further comparative

analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

The federal habeas court's task is not to determine whether some evidence supports the reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety.  Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers the public safety."  Hayward, 512 F.3d 536, 543 (9th Cir. 2008) (citation omitted).

A critical issue in parole denial cases concerns the BPH's use of evidence about the crime that led to the conviction.  Four Ninth Circuit cases guide the application of the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, Irons v. Carey, 479 F.3d 658 (9th Cir. 2007), and Hayward v. Marshall, 512 F.3d 536.  Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass,

which  criticized the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the court.  <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability.  <u>See id.</u> at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  <u>Irons</u> then determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  <u>Irons</u> emphasized that in all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  <u>Irons</u>, 479 F.3d at 665.  Most recently, in <u>Hayward</u>, the Ninth Circuit confronted a case where the prisoner was long past his minimum parole date, and had been in custody for 27 actual years on his 15-to-life sentence. <u>Hayward</u> granted habeas relief to the petitioner, relying on <u>Biggs</u> and <u>Irons</u>, and citing with approval <u>In re. Scott</u>, 133 Cal.App.4th 573, 595 (Cal. Ct. App. 2005) for the proposition that the "'commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.'" <u>Hayward</u>, 512 F.3d at 545.

C.      <u>The BPH's Decision Was Supported By Some Evidence</u>

The BPH determined that Webb was "not suitable for parole and would pose an unreasonable risk of danger to society or threat to public safety if released from prison."  RT 47.  In finding Webb not suitable for parole, the BPH relied on the commitment offense, his escalating pattern of criminal conduct, his unstable social history, and his disciplinary record in prison.

1.      <u>The Commitment Offense</u>

The crime was described in a 2001 life prisoner evaluation report and was read into the record at the 2003 hearing:

7

On January 19, 1984, the deceased, Curtis Martin, and witnesses John Johnson, Janice Marlon, and Wauneta Woodruff . . . arrived in Los Angeles from Monterey, California.  They parked at 115th Street.  At approximately 1915 hours, Webb and three companions approached the victim's car and Codefendant Turner asked the victim if he wanted to purchase PCP.  The victim indicated, no, and it appeared that Webb passed a gun to Codefendant Turner.  At that point, Victim Martin and two companions were ordered out of the car and subsequently robbed.  Statements were made to the effect, if he moves, shoot him in the head.  Witnesses hear two or three gunshots from the driver's side of the vehicle, and it appeared that Codefendant Turner shot the victim Martin.

Resp. Exh. 4, reporter's transcript of November 17, 2003 parole hearing ("RT") at 12-13.

The version of the crime reported in the probation officer's report suggests that this was a

common ruse in the area where the crime took place, i.e., approach a car, offer to sell drugs

and then rob the people in the car.  The report indicates that the victims were in the area to

visit a local resident and not for the purposes of buying drugs.

Webb's version was that the victim pulled the gun while Webb's cohorts were talking

to him, a struggle ensued for the gun, one of Webb's codefendants said "he's got a gun" and

then Turner pulled out a gun and fired one shot.  RT 14. Webb's version also was that he saw

the victim was not breathing so he ran away.  RT 15.  Webb's version was taken from an

earlier report, and he declined to discuss the crime at this hearing.   The BPH was not

required to accept Webb's version, especially since it was inconsistent with his conviction.

2.    Pre-Incarceration History

At the time of the commitment offense, Webb had already amassed a noteworthy

criminal record, even though he was only about 19 years old.  He had numerous offenses as a

juvenile.  In 1977 he was arrested for robbery, and placed in a home on probation in 1977.

Later in 1977, he was arrested for petty theft and referred to a public agency.  And yet again

in 1977, he was arrested for receiving stolen property and burglary and was counseled and

released.  In 1979, he was arrested for petty theft, and counseled and released.  In 1980, he

was arrested for burglary, although the burglary charge was dismissed and a receiving stolen

property charge was sustained.  In 1980, he was put on home probation.  Later in 1980, he

was arrested for receiving stolen property and was placed on probation.  On October 15,

1980, he was arrested for kidnapping for robbery, rape, crimes against children, and grand

theft auto; five counts were later dismissed, and charges of criminal conspiracy and robbery were sustained (for robbery of a bus by a group of masked bandits), and he was sentenced to the California Youth Authority for five years.  In February 1983, he was paroled from the CYA, but was arrested just months later: he was arrested in September 1983 for robbery and again in November 1983 for robbery, although the record did not include information about the disposition of either offense (possibly because he was arrested for the current offense on February 1, 1984).  He was on parole and probation from the CYA at the time of the arrest for the murder.  RT 15-17; <u>see</u> Resp. Exh. 2. .

His social life was "somewhat stable," according to Webb.  RT 18.   He was, nonetheless "constantly on the streets," RT 19, and in a street gang.  He was one of seven children.  One of his brothers had been in prison but was out and had completed parole. Webb was in the Projects Crips street gang, but has been out of the gang for over ten years. RT 19.  He had dropped out of high school in 10th grade.  RT 20.  Before he was incarcerated, he worked with his stepfather doing janitorial work.  While he was in the CYA, he did landscaping and upholstery work.  RT 20.  Webb stated that he did not use any illegal drugs.  He drank beer a couple of times.  RT 21.

Webb has a 14-year old daughter with whom he maintains contact.  RT 22-23, 35-36.

3.     <u>In-Prison Behavior</u>

The BPH panel reviewed Webb's prison conduct and activities since his last parole hearing in 2001, at which it was recommended that he remain disciplinary-free, upgrade vocationally and educationally, and participate in self-help and therapy.

Webb had worked as a porter and was starting the vocational print shop program.  RT 24. He had received positive work evaluations.  RT 24-25.  Webb had completed the graphic arts vocation training in 2003.  He also had done the dry cleaning vocation in 1992 and the plumbing vocation training in 1989 and 1992. RT 25.

Webb obtained his GED in November 1990.  RT 25.

He had a negative disciplinary history.  He had received six CDC-115 rule violation reports.  The most recent CDC-115 was dated October 25, 2002 for disrespect to staff.  He

called a correctional officer a bitch.  RT 39-40.  He also had received six CDC-128(a) counselling memoranda, the most recent of which was in February 1993 for disrespect toward staff.  RT 25-26.

Webb had received favorable evaluations on some of his endeavors.  He had received memoranda for his completion of a two-hour session of a parenting program, and an two-week anger management lecture course.  RT 26.  He apparently had done other programming in prison, but the BPH was focused more on the recent history at this hearing.  RT 24.

His correctional counselor had written an unfavorable evaluation in July 15, 2003.  The counselor wrote that Webb "'would probably pose a moderate degree of threat to the public at this time if released from prison.'"  RT 27.

Webb's psychological report dated March 13, 2001, stated that he had a "'recent psychiatric diagnosis of antisocial personality disorder, improved.'"  RT 27.  The psychologist stated that Webb's violence potential within a controlled setting was considered lower than that of the average level II inmate based in part of the fact that he had not received a disciplinary action in almost 5 years.  RT 29.  His violence potential also was considered no more than that of the average citizen if released into the community.  RT 29.  The psychologist concluded that Webb did not have a mental health disorder in need of treatment and did not appear to have a significant drug or alcohol problem, so there were no recommendations in that area.  RT 29-30.

4.    Parole Plans

If paroled, Webb planned to reside in Colton 0(in San Bernardino County), with a friend.  RT 31.  His former plan (from 2002) to live with his wife had been abandoned due to their marital separation.  RT 31-32. Webb stated that his sister was looking for possible employment opportunities for him.  RT 33.

5.    District Attorney Opposition

The district attorney opposed parole.  RT 41.  He doubted that Webb had "come to grips with his crime" because he refused to discuss it at the hearing and his version offered earlier is substantially different from the witnesses' statements and police report.  RT 41.  The

1    district attorney also pointed out that the counselor's report was unfavorable.  RT 42.  The

2    district attorney's mere opposition to parole generally does not provide a sufficient ground for

3    denying parole, see Hayward, 512 F.3d at 545 n.9, but may be of use in providing a

4    counterpoint to the parole candidate's presentation and focusing on problem areas for the

5    candidate.

6           6.     <u>Consideration of Webb's Case</u>

7        When the full picture is considered, there was some evidence to support the BPH's

8    denial of parole because he was "not suitable for parole and would pose an unreasonable risk

9    of danger to society or a threat to public safety if released from prison."  RT 47.  As noted

10    earlier, the BPH relied on the commitment offense, and Webb's escalating criminality,

11    unstable social history, and disciplinary history to find him not suitable for parole.   With

12    regard to the commitment offense, the BPH stated that the crime was "carried out in an

13    especially cruel and callous manner," that there were multiple victims and one was shot to

14    death.  The crime appeared to have been calculated and was carried out in a manner that

15    demonstrated an exceptionally callous disregard for another human being, and there was an

16    inexplicable motive (apparently referring to the shooting, which was unnecessary to

17    accomplish the robbery).  RT 47.  The murder victim was shot and killed by one of the three

18    other gang members present with Webb, and Webb was not the actual shooter.  The

19    description of the crime does, however, suggest that Webb was the leader, as he originally

20    had the gun and gave it to Turner with directions to shoot in the head anyone who moved,

21    and then Webb was separating the victims from their valuables when Turner fired the fatal

22    shot.  See 15 Cal. Code Regs. § 2402(c)(1).

23        There was strong evidence of an escalating pattern of criminality, although there was

24    no evidence as to whether any of the earlier incidents involved actual violence, as mentioned

25    in the regulation, 15 Cal. Code Regs. § 2402(c)(2).  Webb repeatedly had been in trouble as a

26    juvenile and had failed to profit from the various attempts to correct his criminality, such as

27    juvenile probation, time in the CYA, and parole.  RT 48.  Webb did not grow out of his

28    juvenile delinquency but continued to engage in criminal activity until put in prison for the

1  current offense.  He was on parole and probation from the CYA at the time of the current

2  offense.

3       There was evidence to support for the BPH's finding of an unstable social history, as

4  the BPH pointed to the criminality described above, the lack of adult supervision and the

5  existence of street gang activity as indicative of an unstable social history.  RT 48.

6       There also was support for the BPH's reliance on Webb's failure to demonstrate

7  evidence of positive change: he had receive a CDC-115 after his most recent parole hearing

8  for calling a correctional officer a bitch in the dining hall, which the BPH panel thought

9  could have incited a riot because it occurred in a dining hall in which the inmate to guard

10 ratio was very high.  See RT 48, 52.  The BPH wanted a new psychological report with a

11 new evaluation of Webb's dangerousness because of the CDC-115 and also to explore

12 whether he needed further work to explore the underlying causes of the commitment offense.

13 RT 53-54.

14       The existence of some evidence to support the cited reasons does not end the matter,

15 as the focus here remains on whether there was some evidence to support the decision that

16 Webb's release unreasonably endangers public safety.  See Hayward, 512 F.3d at 543.

17 Webb's pre-incarceration criminal activity can be relied upon to assess his current

18 dangerousness.  The cluster of Ninth Circuit cases discussed earlier instruct that the BPH can

19 look at immutable events, such as the nature of the conviction offense and pre-conviction

20 criminality to predict current unsuitability, but the weight to be attributed to those immutable

21 events should decrease over time as a predictor of future dangerousness as the years pass *and*

22 *the prisoner demonstrates favorable behavior.*  Here, Webb has continued to engage in

23 misconduct in prison, so that his behavior undermines rather than supports a view that he has

24 been rehabilitated.  he had received six CDC-115s, the most recent of which was just one

25 year before the parole hearing at issue.  Regardless of whether he considers them serious, the

26 disciplinary actions do reflect an unwillingness to follow rules and conform to societal

27 norms.  Although Webb had positive accomplishments in prison, his continuing misconduct

28 takes his case out of the category of cases where the BPH is relying on only pre-incarceration

12

1  facts that the prisoner can never change.  Webb does have control over his behavior in

2  prison, and the BPH may consider that misconduct in determining whether he is

3  rehabilitated. Under the circumstances, the BPH's reliance on the circumstances of the

4  murder and unfavorable pre-incarceration behavior and history did not offend due process.

5

6          The Los Angeles County Superior Court correctly identified the "some evidence"

7  standard as the applicable standard for judicial review, as evidenced by its citation to In re

8  Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v.

9  Hill some evidence standard as the proper standard for judicial review of evidentiary

10  sufficiency for parole denial cases.  See Rosenkrantz, 29 Cal. 4th at 665-67.   And the court's

11  decision was a reasonable application of the some evidence standard.  The superior court

12  determined that the nature of the commitment offenses committed at age 19, plus Webb's

13  lengthy juvenile criminal record, plus his unstable social history (that included him

14  constantly being on the streets and street gang membership – an affiliation that lasted until

15  about a decade before the parole hearing and therefore continued for almost a decade after

16  his current imprisonment started), plus his disciplinary record, even when viewed together

17  with his accomplishments in prison, provided some evidence to support the BPH's decision

18  that Webb was not suitable for parole.  See Resp. Exh. 5.  Webb is not entitled to relief under

19  the standard of 28 U.S.C. § 2254(d).

20  D.     Breach Of Plea Agreement Claim

21          "Plea agreements are contractual in nature and are measured by contract law

22  standards."  Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting  United States v.

23  De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)).  Although a criminal defendant has a due

24  process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S.

25  257, 261-62 (1971), there is no evidence that Webb's subjective expectations about how

26  parole would be decided were part of the plea agreement.  Webb also provides no evidence

27  that there was a "guarantee of parole." Traverse, p. 9.  His sentencing documents clearly

28  reflect an indeterminate sentence of 15 years to life on the murder conviction and not a

straight 15 year sentence.  Resp. Exh. 1.  As Webb concedes, he received a sentence of 15 to life on the murder charge, with the possibility of parole.  Traverse, p. 8.  The possibility of parole does not mean a guarantee of parole; under state law (as it existed when he was sentenced and as it exists now), the inmate must be found suitable before his term and release date are set.  Webb has received the parole considerations to which he was entitled under that agreement and sentence.  Unlike the case of Brown v. Poole, 337 F.3d at 1157-58, on which he relies, Webb does not identify any actual promise made to him or any particular term of the agreement that has been breached.  The Brown petitioner was able to point to explicit statements in the plea colloquy that led her to believe she would get out in half the minimum years if she behaved herself in prison.  See id. at 1160 ("Brown heard and acknowledged the prosecutor's promises, and in the process of waiving her right to trial she accepted them as part of her bargain.  The intent of the parties becomes clear upon an examination of the language of the plea agreement and the conduct of the parties during the plea colloquy.")  This court agrees with the state superior court's statement that Webb received an indeterminate term, but disagrees with the statement that there could not be a breach because the BPH was not a party to the agreement.  See Resp. Exh. 1, order, p. 2 & n.1.  Brown v. Poole stated that, if there was a breach of an agreed upon term of imprisonment, specific performance of the plea agreement could be ordered in a habeas action, see 337 F.3d at 1159, 1162, and did so without regard to the fact that parole authority that made the decision was a different entity from the prosecutor.  Brown suggests that the government as a whole is on one side and the prisoner is on the other for purposes of viewing the contractual relationship.  Webb has been given parole consideration and has not been kept in custody beyond the end of the life term he received.  His claim that his plea agreement was breached in violation of his right to due process fails.

/   /   /

/   /   /

1    E.    Claim For Failure To Set a Term Under The Matrix

2        Webb argues that the BPH violated due process by failing to consult the matrix and

3    fix a term for him.  As discussed in Section B, above, the matrix is not consulted under state

4    law unless and until the inmate has been found suitable.  Webb has never been found suitable

5    for parole, so the day to consult the matrix has not yet arrived.   There was no due process

6    violation in not consulting the matrix and not setting a term for him.

7                                    **CONCLUSION**

8        For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  The

9    clerk shall close the file.

10       IT IS SO ORDERED.

11   DATED: March 19, 2008

12                                    Marilyn Hall Patel
                                      United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        15

**NOTE**

1.      The listed circumstances tending to show underline unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).